WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Scenic Arizona,<br><br>        Plaintiff,<br><br>v.<br><br>Scenic America,<br><br>        Defendant. | No. CV-25-00099-TUC-JGZ<br><br>**ORDER** |

Pending before the Court is Defendant Scenic America's motion to dismiss for lack of personal jurisdiction. (Doc. 7.) The motion is fully briefed. (Docs. 10, 11.) For the reasons that follow, the Court will deny the motion.

**I.    Background**

    **A.    Factual Allegations in the Complaint**

In November 2001, non-party Mark Mayer founded Plaintiff Scenic Arizona as an affiliate of Defendant Scenic America. (Doc. 1-6 ¶ 8.) Mayer generally led Scenic Arizona until his death on July 27, 2024. (*Id.*) As an affiliate, Scenic Arizona was required to pay Scenic America annual dues equal to 5% of Scenic Arizona's revenue, or a minimum of $250.00. (*Id.* ¶ 9.) Scenic Arizona alleges, on information and belief, Mayer had handled past donations to Scenic Arizona and remitted 5% of any bequest or gift Scenic Arizona received to Scenic America. (*Id.* ¶ 10.) Scenic Arizona further alleges that Mayer would reasonably have expected that any bequest Mayer made to Scenic America would result in 5% being paid to Scenic America and the balance remitted for use by Scenic Arizona. (*Id.*

¶ 11.)

On December 29, 2014, Mayer executed application paperwork to open a charitable account (the "Account") with Charles Schwab Corporation ("Schwab"), identifying Scenic Arizona as the named beneficiary of the Account. (*Id*. ¶¶ 12–13.) Although Mayer named Scenic Arizona as the beneficiary, Mayer provided the Employment Identification Number (EIN), address, and phone number of Scenic America. (*Id.*) Scenic America, however, was not mentioned by name on the Account paperwork. (*Id.*)

After Schwab was informed of Mayer's death by the executor of his estate, Schwab sent Scenic America a letter dated August 16, 2024 and the Account's funds totaling $195,531.09 in the form of a grant (the "Grant"). (*Id*. ¶ 14.) The letter accompanying the Grant contained a line item, "Grant Designation," which stated: "This grant is for Scenic Arizona." (*Id*.) Scenic America did not notify Scenic Arizona of Scenic America's receipt of the Account funds. (*Id*. ¶ 18.)

Scenic Arizona first became aware of the Account and the Grant when the executor of Mayer's estate notified Scenic Arizona, on September 30, 2024, that it had been identified as the beneficiary of the Account. (*Id*. ¶ 20.) Upon inquiry, Schwab informed the executor that Schwab had paid the Grant to Scenic America based on the EIN number contained in the Account paperwork. (*Id*. ¶ 21.) On October 7, 2024, Scenic Arizona obtained a copy of the application paperwork which showed Scenic Arizona as the named beneficiary. (*Id*. ¶ 19.) That same day, Scenic Arizona contacted Scenic America, explaining that the Account funds had been transferred to Scenic America but that Scenic Arizona was the named beneficiary of the Grant. (*Id*. ¶ 23.) Scenic Arizona requested that Scenic America transfer the balance of the Grant (the Grant funds minus affiliate dues owing) to Scenic Arizona as the existing arrangement between the two entities required. (*Id*. ¶¶ 17, 23.) Scenic America requested that Scenic Arizona reiterate its explanation via email. (*Id*. ¶ 24.)

On October 8, 2024, Scenic Arizona sent Scenic America an email and attached a copy of the letter sent by Schwab to Scenic America, which stated: "This grant is for Scenic

Arizona." (*Id*. ¶ 25.) On October 9, 2024, Scenic America responded by requesting "a copy of the original [Account] paperwork" and "anything else regarding Mark and Schwab" in Scenic Arizona's possession. (*Id*. ¶ 26.) Also on October 9, the executor contacted Scenic Arizona and forwarded a message from Schwab which, while acknowledging that "the designation of the grant is Scenic Arizona," cited its Program Policies to explain that it identifies the "intended organization" for the purposes of transfer based on the "EIN," and that "[i]t is the responsibility of the organization [Scenic America] to apply the funds where the designation specifies." (*Id*. ¶ 27.)

On October 14, 2024, Scenic Arizona emailed Scenic America, attaching the original application paperwork, the letter from Schwab to Scenic America, and recounting the correspondence between Scenic Arizona, the executor, and Schwab, including Schwab's acknowledgement that Scenic Arizona was the organization to which the Grant was designated and that Scenic America was the organization responsible for "applying the funds where the designation specifies." (*Id*. ¶ 29.) Scenic Arizona requested the funds be so applied to Scenic Arizona. (*Id*. ¶ 30.)

By November 22, 2024, Scenic America had not acknowledged Scenic Arizona's October 14, 2024 email, so Scenic Arizona sent Scenic America a certified letter reiterating the points of the email and providing the same two attachments. (*Id.* ¶ 31.)

On December 10, 2024, Scenic Arizona and Scenic America held a Zoom meeting which included Scenic Arizona's leadership and Mark Falzone, the President of Scenic America. (*Id*. ¶ 32.) During that meeting, Scenic Arizona asked whether Mayer was following a protocol established by Scenic America when providing the EIN with the understanding that Scenic America would accept its annual mandated percentage from the Account (i.e., 5%) and return the remainder to Scenic Arizona, but Falzone refused to answer. (*Id*. ¶ 33.) Falzone denied knowledge of the Schwab letter identifying Scenic Arizona as the beneficiary of the Grant and denied knowledge of the source of the Grant money because Mayer's name was not on the letter. (*Id*. ¶¶ 34–35.) Falzone also said it did not matter what the Grant designation said and refused to remit any amount to Scenic

Arizona, instead stating that Scenic America would not honor the existing agreement to retain only 5% of any donation. (*Id*. ¶ 36.)

On January 7, 2025, Scenic Arizona filed suit against Scenic America in Pima County Superior Court. (Doc. 1-6.) In its Complaint, Scenic Arizona asserts four claims against Scenic America: breach of contract (Count I); breach of the implied covenant of good faith and fair dealing (Count II); conversion (Count III); and unjust enrichment (Count IV). (*Id*. ¶¶ 40–65.) Scenic Arizona also requests the Court declare a constructive trust (Count V). (*Id.* ¶¶ 66–77.) Scenic America removed the case to this Court on February 28, 2025. (Doc. 1.)

**B.     Facts Asserted by Defendant Scenic America in its Motion to Dismiss**

Scenic America asserts additional facts through the declaration of Falzone. (Doc. 7-1.) Falzone avers Scenic America is a 501(c)(3) nonprofit organization incorporated under the Commonwealth of Pennsylvania with its principal place of business in the District of Columbia, (*id*. ¶¶ 3–4); it has never maintained a place of business in the State of Arizona, nor been a citizen of the State of Arizona, (*id*. ¶ 5); and it is not doing business in the State of Arizona or registered as a foreign corporation in Arizona, (*id*. ¶ 6).

Related to the allegations in the Complaint, Falzone avers: Scenic America has chapters and affiliates located in different states, (*id*. ¶ 7); Scenic Arizona was loosely considered an affiliate, although it had had never entered into an affiliate agreement with Scenic America, (*id*. ¶ 8); Scenic Arizona had not been an "active affiliate," and was considered an affiliate by Scenic America "in name only," (*id*. ¶ 12); Scenic Arizona is no longer an affiliate of Scenic America, (*id*. ¶ 9); Scenic Arizona has occasionally paid dues to Scenic America but has not consistently paid the required minimum dues for affiliates, (*id*. ¶ 10); and Scenic Arizona has not paid dues to Scenic America since March 2023, (*id*. ¶ 11.) Falzone acknowledges that Scenic America received a letter and a check in the amount of $195,531.90, which was identified as a grant made on behalf of Urban Environmental Fund at Schwab Charitable, (*id*. ¶ 13), and states that Scenic America did not apply for or solicit the Grant, (*id*. ¶ 14).

### C. Facts Asserted by Scenic Arizona in its Response to the Motion

Scenic Arizona provides documents which call into question the truthfulness of several of the statements included in Falzone's declaration, including a screen shot of Scenic America's website showing that Scenic Arizona was listed as one of "Our Affiliates" as recently as January 15, 2025, (Doc. 10-1 ¶ 9, Ex. 3 at 14–16), and emails showing ongoing correspondence between Falzone and Mayer regarding Scenic Arizona's payment of dues to Scenic America, including dues for 2022 and 2023, (*id.* ¶¶ 10–11, Ex. 1 at 8–11). In the emails, Falzone requests that Mayer pay Scenic Arizona's affiliate dues and produce its financials to confirm the amount of dues owed. (*Id.* at 9–11.)

Scenic Arizona also provided a letter dated January 17, 2025—the same date this lawsuit was filed—from Falzone, as President of Scenic America, to the Tucson City Council, opposing Tucson Electric Power's (TEP) Midtown Reliability Project for its reliance on above-ground transmission lines, (*id.* ¶ 13, Ex. 4 at 17–20), and a copy of a February 28, 2025 post on Scenic America's website,[1] which credits Scenic America with playing "a key role in [the Tucson Zoning Examiner's rejection of TEP's proposed overhead transmission lines] by assisting with testimony that highlighted the potential harm to Tucson's scenic landscapes, historic neighborhoods, and quality of life." (*Id.*, Ex. 5 at 22–24.)

## II. Burden of Proof

The plaintiff bears the burden of demonstrating that personal jurisdiction is proper. *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1106 (9th Cir. 2020) (citing *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004)). Where the motion to dismiss for lack of personal jurisdiction is based on written materials rather than an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts." *Id.* In such cases, the court takes as true all uncontroverted allegations in the complaint and resolves all genuine factual disputes in the

---

[1] *See* SCENIC AMERICA, *A Victory for Scenic Beauty and Community Character in Tucson, Arizona*, February 28, 2025, https://www.scenic.org/2025/02/28/a-victory-for-scenic-beauty-and-community-character-in-tucson-arizona/ (last visited June 6, 2025).

plaintiff's favor. *Id.*

### III. Personal Jurisdiction

Where "there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits." *Schwarzenegger*, 374 F.3d at 800 (citing Fed. R. Civ. P. 4(k)(1)(A)). "The Arizona long-arm statute provides for personal jurisdiction co-extensive with the limits of federal due process." *Doe v. Am. Nat'l Red Cross*, 112 F.3d 1048, 1050 (9th Cir. 1997); *see also* Ariz. R. Civ. P. 4.2(a). Under the Fourteenth Amendment's Due Process Clause, a court's authority depends on a plaintiff "having such 'contacts' with the forum State [to ensure] 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945)).

There are two types of personal jurisdiction: general and specific. *See Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014). General jurisdiction exists over a nonresident defendant when the defendant's "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Id.* at 127 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)); *see also Schwarzenegger*, 374 F.3d at 801. The court considers the contacts' "[l]ongevity, continuity, volume, economic impact, physical presence, and integration into the [forum] state's regulatory or economic markets." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1224 (9th Cir. 2011) (citation omitted).

"[S]pecific jurisdiction covers defendants . . . less intimately connected with a state, but [who] have sufficient minimum contacts with the state . . . relevant to the lawsuit." *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 859 (9th Cir. 2022). To exercise specific (or "case-linked") personal jurisdiction, "there must be an affiliation between the forum and the underlying controversy, principally, an activity or occurrence that takes place in the forum state." *Ford Motor Co.*, 592 U.S. at 259 (internal quotation and citation omitted).

- 6 -

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014) (citation and internal quotation marks omitted).

Scenic Arizona contends the Court has specific jurisdiction over Scenic America. Specific jurisdiction is analyzed under a three-part test:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Herbal Brands v. Photoplaza, Inc.*, 72 F.4th 1085, 1090 (9th Cir. 2023) (quoting *Schwarzenegger*, 374 F.3d at 802), *cert. denied*, 144 S. Ct. 693 (2024). The plaintiff bears the burden of proving the first two prongs; "the burden then shifts to the defendant to present a compelling case that the exercise of jurisdiction would not be reasonable." *Id.* (internal quotation marks omitted) (quoting *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068–69 (9th Cir. 2017)).

"[T]he first prong 'may be satisfied by purposeful availment,' 'by purposeful direction,' or 'by some combination thereof.'" *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (9th Cir. 2023) (quoting *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc)), *cert. denied*, 144 S. Ct. 826 (2024). Although the Ninth Circuit typically applies purposeful direction analyses to intentional tort claims and purposeful availment analyses to contract and unintentional tort claims, there is no "rigid dividing line between these two types of claims." *Id.* (quoting *Glob. Commodities*, 972 F.3d at 1107).

To analyze whether a tort was purposefully directed to Arizona, the Court applies "the '*Calder* effects' test, which focuses on the forum in which the defendant's actions

were felt, whether or not the actions themselves occurred within the forum." *Briskin v. Shopify, Inc.*, 135 F.4th 739, 751 (9th Cir. 2025) (en banc) (quoting *Mavrix Photo*, 647 F.3d at 1228). "[T]he purposeful direction test requires that the defendant (1) commit an intentional act, that is (2) expressly aimed at the forum state, and (3) which causes harm that the defendant knows will be suffered in the forum state." *Id.* (citation omitted). "So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, [the Supreme Court has] consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id.* at 752. Contacts with the forum state can be in the form of electronic contacts. *Id.*

Purposeful availment exists when a defendant "performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state." *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008). Courts determine purposeful availment by analyzing whether a defendant has "engaged in significant activities within a State or has created 'continuing obligations' between [itself] and the residents of the forum." *Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th Cir. 1990) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985)).

"The second requirement for specific jurisdiction is that plaintiff's claims 'must arise out of or relate to the defendant's contacts' with the forum State." *Briskin*, 135 F.4th at 760 (quoting *Ford Motor Co.*, 592 U.S. at 359). "The first half of th[e] standard asks about causation; but . . . some relationships will support jurisdiction without a causal showing." *Herbal Brands*, 72 F.4th at 1096 (quoting *Ford Motor Co.*, 592 U.S. at 362).

The third prong of the specific jurisdiction test consists of a seven-factor balancing test employed to determine the reasonableness of asserting personal jurisdiction. *Briskin*, 135 F.4th at 761. The seven factors include:

> (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Id.* (quoting *Herbal Brands*, 72 F.4th at 1096). "No one factor is dispositive; a court must balance all seven." *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1323 (9th Cir. 1998).

## IV.   Disputed Facts

### A.   Evidentiary Disputes

In evaluating its contacts with the State, Scenic America argues that the Court should not consider the paperwork submitted to open the Schwab Account, the email communications between Falzone and Mayer, and the statements attributed to the executor and Schwab because this evidence was not submitted in an admissible form and either lacks authentication or foundation, or contains hearsay. (Doc. 11 at 2–4.) In support, Scenic America cites *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002), and *Garcia v. Fannie Mae*, 794 F. Supp. 2d 1155, 1162 (D. Or. 2011), where the courts held that unauthenticated evidence cannot be considered in a motion for summary judgment. (Doc. 11 at 2–4.)

The Court finds Scenic America's argument unpersuasive for several reasons. First, the pending motion is not a motion for summary judgment. *See Will Co. v. Lee*, 47 F.4th 917, 921 (9th Cir. 2022) ("When the Defendant's [Rule 12(b)(2)] motion is based on written materials rather than an evidentiary hearing, . . . we only inquire into whether the plaintiff's pleadings and affidavits make a prima facie showing of personal jurisdiction." (cleaned up)), o*verruled in part on other grounds by Briskin*, 135 F.4th at 751; *Mkt./Media Rsch., Inc. v. Union Trib. Pub. Co.*, 951 F.2d 102, 105 (6th Cir. 1991) ("[A]lthough a motion for summary judgment and a Rule 12(b)(2) motion are similar in some respects, in sharp contrast to summary judgment procedure, the court disposing of a 12(b)(2) motion does not weigh the controverting assertions of the party seeking dismissal." (cleaned up)); *Hammons v. Lasik Vision Inst., LLC*, No. 04-2243-B, 2006 WL 2583162, at *1 (W.D. Tenn. Sept. 6, 2006) (citing *Attwell v. Lasalle Nat'l Bank*, 607 F.2d 1157, 1161 (5th Cir. 1979), *cert. denied*, 445 U.S. 954 (1980)) ("When materials outside the pleadings are submitted in a motion to dismiss for lack of personal jurisdiction, federal courts will not convert the Rule 12(b)(2) motion to a motion for summary judgment."); *cf.* Fed. R. Civ. P.

12(d) ("If, on a motion under Rule *12(b)(6) or 12(c)*, matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." (emphasis added)).

Second, even if this was a Rule 56 motion, *Orr*'s pronouncement of Rule 56's evidentiary requirements is no longer valid. The 2010 Amendments to Rule 56 require the Court to consider unauthenticated evidence on summary judgment if the evidence could be presented in a form that would be admissible at trial.[2] *See* Rule 56(c)(2) ("A party may object that the material cited to support or dispute a fact *cannot be presented* in a form that would be admissible in evidence." (emphasis added)); *Harlow v. Chafey Cmty. Coll. Dist.*, 2022 WL 4077103, at *1 (9th Cir. Sept. 6, 2022) ("The district court's reliance on *Orr*'s interpretation of Rule 56 before the 2010 amendments was an error because the legal standard has since changed."); *In re Luxury Jet Ski Rentals LLC*, 2024 WL 3367530, at *7 (S.D. Cal. July 9, 2024) ("The Court first notes that *Orr* has been superseded by statute."). In light of the many recent cases that state the Rule 56 evidentiary standard, it is concerning that Scenic America would rely on caselaw that is outdated and incorrect.

Third, although Scenic America challenges whether certain evidence was presented in an admissible form, it does not dispute the legitimacy of the evidence. Scenic America admits that Scenic Arizona was affiliated with it and paid dues to it through March 2023. (Doc. 11 at 4.) Scenic America does not deny that it listed Scenic Arizona as an affiliate on its website or that Scenic Arizona was required to pay dues. Scenic America does not deny that Falzone corresponded with Mayer by email with the intention of having Mayer

---

[2] The evidence challenged by Scenic America could be presented in an admissible form. The Schwab account documents could be authenticated by Schwab's custodian of records. *See* Fed. R. Evid. 901(b)(1), 902(11). The information needed to authenticate the email exchange between Falzone and Scenic Arizona could be obtained from Scenic America or Falzone in discovery. (Doc. 11 at 3.) The hearsay statements of the executor and Schwab representatives could be introduced at trial through the witnesses who made the statements. *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) (concluding that "even the declarations that contain hearsay are admissible for summary judgment purposes because they could be presented in an admissible form at trial" (cleaned up)); *see Sagdai v. Travelers Home & Marine Ins. Co.*, 639 F. Supp. 3d 1091, 1102 (W.D. Wash. 2022) (holding the Court must consider hearsay evidence presented for the purposes of the motion for summary judgment if it can "be presented in a form that would be admissible at trial").

pay Scenic Arizona's affiliate dues. Scenic America does not deny that these emails were exchanged—an assertion which its attorneys could easily evaluate by speaking with Falzone. (*See id.* at 3.) Scenic America does not dispute that the amount of the dues that Scenic Arizona was required to pay to Scenic America was $250 or 5% of any bequest or gift. Moreover, Scenic America does not dispute the Schwab documents are the actual account documents. The Schwab Account documentation appears to be exactly what Scenic Arizona says it is, namely a letter sent from Schwab to Scenic America along with the Grant check and account opening forms. Scenic America admits that it received the Grant check, accompanying letter, and copies of the account opening forms provided by Plaintiff. (*See* Doc. 10-1 at 12–13.) Scenic America does not deny that the Grant shows Scenic Arizona as the beneficiary of the Grant.

Finally, even if Scenic America did dispute the facts established by the documentation, in a motion to dismiss for lack of personal jurisdiction, disputes of fact are resolved in the plaintiff's favor. *Glob. Commodities*, 972 F.3d at 1106. In addition, Scenic Arizona's evidence refutes many of Falzone's statements in his declaration, calling into question his credibility, and the value of the declaration as evidence. Because there is a question of credibility as to Scenic America's facts, the Court could not accept Scenic America's evidence as refuting Scenic Arizona's allegations as to the two entities' relationship.

### B. Disputed Jurisdictional Allegations

Scenic America disputes as unsupported Scenic Arizona's jurisdictional allegations that: Mayer had handled other donations made to Scenic Arizona in the past and accordingly remitted 5% of any bequest or gift Scenic Arizona received to Scenic America, (Doc. 1-6 ¶ 10); Mayer would reasonably have expected that any bequest Mayer may have made to Scenic America would result in 5% being paid to Scenic Arizona and the balance remitted for use by Scenic Arizona, (*id.* ¶ 10); Falzone refused to honor the existing agreement to retain only 5% of any donation, (*id.* ¶ 36); and Mayer intentionally identified the beneficiary as "Scenic Arizona," but provided Scenic America's EIN, phone, and

address, to ensure that Scenic Arizona's annual dues would be paid pursuant to the traditional understanding between the two organizations, trusting that the remaining funds would be applied where the designation specified, "To Scenic Arizona," (*id.* ¶ 37). But the documentation Scenic Arizona produced, and particularly Falzone's emails, supports Scenic Arizona's allegations, at least to the extent that the emails show that Scenic Arizona was an affiliate of Scenic America, Scenic America required its affiliates to pay dues in the amount of 5% of any donation, and Scenic America required Scenic Arizona to provide documentation to prove it was paying 5% of such donations. Further evidence to prove or disprove these jurisdictional allegations is likely in the possession of Scenic America and it is inextricably intertwined with the merits of Scenic Arizona's claims. It would be premature to dismiss this action on jurisdictional grounds under these circumstances. *See City & Cnty. of San Francisco v. Purdue Pharma L.P*, 491 F. Supp. 3d 610, 634 (N.D. Cal. 2020) (quoting *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 n.2 (9th Cir. 1977)) ("[I]f the 'jurisdictional facts are intertwined with the merits,' such that 'a decision on a jurisdictional issue is dependent on the merits . . . [i]t is preferable that this determination be made at trial, where a plaintiff may present his case in a coherent, orderly fashion and without the risk of prejudicing his case on the merits.").

## V. Discussion

The Court concludes that Scenic Arizona has made the prima facie showing of jurisdictional facts required to withstand Scenic America's motion to dismiss.

### A. Scenic America Purposefully Directed its Activities Towards Arizona and Purposefully Availed Itself of the Privilege of Conducting Activities in Arizona

"[T]he first prong of the personal jurisdiction test 'may be satisfied by purposeful availment, by purposeful direction, or by some combination thereof.'" *Briskin*, 135 F.4th at 751 n.10 (quoting *Davis*, 71 F.4th at 1162).[3]

---

[3] As noted above, the purposeful direction test typically applies to tort claims, and the purposeful availment test typically applies to contract claims. *Davis*, 71 F.4th at 1162. Here, Scenic Arizona asserts both breach of contract and tort claims, (*see* Doc. 1 at 6–8), and the Court will apply both tests. *See Glob. Commodities*, 972 F.3d at 1107 ("When both contract and tort claims are at issue, both tests are relevant.").

1. Purposeful Direction

"[T]he purposeful direction test requires that the defendant (1) commit an intentional act, that is (2) expressly aimed at the forum state, and (3) which causes harm that the defendant knows will be suffered in the forum state." *Briskin*, 135 F.4th at 751.

Here Scenic America purposefully directed its actions towards Arizona. Scenic America committed intentional acts when it deposited the Grant for which Scenic Arizona was the named beneficiary in its own account and refused to remit any part of the Grant to Scenic Arizona. Scenic Arizona alleges that it informed Scenic America of the Grant being sent to Scenic America, provided the underlying documentation to Scenic America, requested the funds be returned, and held a meeting via Zoom with Falzone to discuss the issue. (*Id.* ¶¶ 21, 24–25, 30, 32–33.) But Scenic America refused to disgorge the Grant which showed Scenic Arizona as the beneficiary.

Scenic America knew the impact of its intentional acts would be felt in Arizona. Scenic America knew Scenic Arizona was a resident of Arizona and knew that its retention of a substantial donation intended for Scenic Arizona would affect Scenic Arizona in its residence. "The 'express aiming' requirement of the effects test is met 'when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state.'" *CE Distrib., LLC v. New Sensor Corp.*, 380 F.3d 1107, 1111 (9th Cir. 2004) (quoting *Bancroft & Masters v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000)).

Finally, Scenic America's actions did in fact harm Scenic Arizona in the forum state and Scenic America knew that such harm would be felt in the State of Arizona. Scenic Arizona requested the Grant funds be applied to its affiliate dues and the remainder returned to Scenic Arizona and provided Scenic America with relevant documentation supporting its request, and Scenic America refused to honor the affiliate agreement and beneficiary designation, instead retaining the entire Grant. (Doc. 1-6 ¶¶ 21, 24–25, 30–36.)

2. Purposeful Availment

Scenic America purposefully availed itself of this forum by creating continuing

- 13 -

obligations between itself and Scenic Arizona, a resident of the forum. *See Burger King*, 471 U.S. at 475–76. Scenic America recognized Scenic Arizona as an affiliate which had obligations to Scenic America pursuant to an affiliate agreement. The agreement required Scenic Arizona to provide financial information and pay affiliate dues to Scenic America. Scenic America solicited annual affiliate dues from Scenic Arizona in fulfillment of the affiliate arrangement. (Doc. 10-1 at 10–11.) The solicitation is evidenced in the emails sent by Falzone as President of Scenic America to Mayer in Arizona requesting payment of Scenic Arizona's affiliate dues and proof of its financials. (*Id.*)

In a January 28, 2022 email to Mayer, with the subject line "Scenic Arizona dues," Falzone wrote:

> I hope this message finds you safe, healthy, and energized for the new year ahead of us.
>
> As Scenic America continues its fundraising efforts for our 2021-22 fiscal year, I am bringing to your attention this request for your affiliate dues. We are grateful to have partners like you who support our work on the national stage while also carrying out our mission on the state and local level.
> . . .
> As we near the end of the 2021-22 fiscal year, **we are asking affiliates to pay their dues of 5% of your revenue last year**. Please send us a financial statement with your revenue from last year so we can determine the amount. If your income was less than $5,000 in 2021, then your dues are $250.
>
> We would appreciate payment by March 31, 2022, the end of our fiscal year. Contributions by check can be mailed to Scenic America's office at the address below, or you can make a secure online donation <u>on this page</u>.

(*Id.*)

That same day Mayer responded on behalf of Scenic Arizona that the dues were forthcoming but there could be some delay due to the financial institution cancelling check writing privileges for Scenic Arizona's type of account and the transition to a new financial institution. (*Id*.)

On March 15, 2022, Falzone emailed Mayer again to ask about the status of the transition, and implicitly, about Scenic Arizona's payment of delinquent dues. (*Id*. at 9–10.)

On December 3, 2022, Falzone again emailed Mayer about the dues owed "from

- 14 -

last year, and now this year." (*Id.* at 9.) Mayer responded on December 5, 2022, stating that a personal check was in the mail to cover the 2021–2022 dues and a check would be forwarded prior to the end of the current fiscal year in March 2023. (*Id.*) Mayer explained the non-payment was not a financial issue but a result of changing banks. (*Id.*)

In these same emails, Scenic America referred to the "wide array of tools and support" it offers to its affiliates, including "[p]artnering with our . . . affiliates . . . on signage and scenic blight matters," and providing "[a]ccess to advanced legislative and regulatory tracking." (*Id.* at 11.) In addition, as stated by Falzone, Scenic America's "many achievements further both [Scenic Arizona and Scenic America's] missions." (*Id.* at 10.)

The emails sent from Scenic America's president to Scenic Arizona referencing a business relationship from at least 2021 forward, show an agreement between the parties and the ongoing obligations Scenic America required of Scenic Arizona. (*See* Doc. 10-1 at 9–11); *Gray & Co.*, 913 F.2d at 760 ("A defendant has purposefully availed himself of the benefits of a forum if he . . . has created continuing obligations between himself and the residents of the forum." (internal quotation marks omitted)). While the full nature—or enforceability—of the affiliate agreement may shed light on the extent of Scenic America's contacts with Arizona and obligations between Scenic America and Scenic Arizona, at this stage Scenic Arizona "need only make a prima facie showing of jurisdictional facts." *Glob. Commodities*, 972 F.3d at 1106 (citation and internal quotation marks omitted).

**B.   Scenic Arizona's Claims Arise out of Scenic America's Forum-Related Activities**

"The second requirement for specific jurisdiction is that plaintiff's claims 'must arise out of or relate to the defendant's contacts' with the forum State." *Briskin*, 135 F.4th at 760 (quoting *Ford Motor Co.*, 592 U.S. at 359). "The first half of th[e] standard asks about causation; but . . . some relationships will support jurisdiction without a causal showing." *Herbal Brands*, 72 F.4th at 1096 (quoting *Ford Motor Co.*, 592 U.S. at 362).

Scenic Arizona has met its burden of showing its claims arise out of or relate to Scenic America's contacts with Arizona. Scenic Arizona alleges a contractual relationship with Scenic America, by which Scenic Arizona acted as an affiliate and partner of Scenic

America to carry out the national organization's agenda in Arizona.[4] (Doc. 1-6 ¶¶ 7, 9, 41–43, 49; Doc. 10-1 at 9–11, 15–16, 18–23.) As part of that relationship, Scenic Arizona paid affiliate dues to Scenic America. (Doc. 1-6 ¶ 9.) Mayer, as Scenic Arizona's director, president, and treasurer, was heavily involved in maintaining that relationship and ensuring Scenic America received dues from Scenic Arizona. (*Id.* ¶¶ 2, 8; Doc. 10-1 at 9–11.) Mayer opened the Account in 2014, identifying Scenic Arizona as beneficiary. (Doc. 1-6 ¶¶ 12–13.) Upon Mayer's death, Schwab sent the Account's funds, the Grant, to Scenic America, with a letter stating the Grant was "for Scenic Arizona." (*Id.* ¶¶ 14–16.)

Scenic America's retention of the Grant funds is the basis of Scenic Arizona's claims. Therefore, Scenic Arizona's claims that Scenic America breached its contractual relationship with Scenic Arizona and converted funds intended for Scenic Arizona to its own use arise out of Scenic America's contacts with Arizona, i.e., Scenic America's relationship with its affiliate and the payment of affiliate dues. Scenic Arizona "would not have been injured 'but for' [Scenic America's] conduct directed toward [Scenic Arizona] in [Arizona]." *Panavision Int'l*, 141 F.3d at 1322. The retention of the Grant funds, although Scenic America physically received them in Washington, D.C., (*see* Doc. 7 at 5), had the effect of injuring Scenic Arizona in Arizona. *See Panavision Int'l*, 141 F.3d at 1322 (holding plaintiff's trademark dilution claims arose out of defendant's registration of plaintiff's trademarks on the internet even though defendant's activities did not physically occur in the forum state). At minimum, Scenic Arizona's claims *relate to* Scenic America's contacts with Arizona. *See Herbal Brands*, 72 F.4th at 1096. Thus, Scenic Arizona has met its burden of making a prima facie showing that its claims arise out of or relate to Scenic America's Arizona-related activities. *Will Co.*, 47 F.4th at 921.

Scenic America argues "there are no factual allegations supporting the existence of any agreement between the parties requiring Scenic America to remit to Plaintiff a portion of any third party donation received by Scenic America." (Doc. 11 at 6.) This argument

---

[4] Scenic America disclaims the existence of such a relationship since "the 2022–2023 fiscal year," but a dispute of fact exists as to the timing and duration of the affiliate relationship. (Doc. 10-1 ¶¶ 9–14); *see Glob. Commodities*, 972 F.3d at 1106 ("[W]e . . . resolve all genuine factual disputes in the plaintiff's favor.").

ignores: (1) the fact that the donation was designated "for Scenic Arizona," not Scenic America; (2) the allegation that Scenic Arizona paid 5% of all revenue to Scenic America as dues; (3) the allegation that Falzone "refused to answer" when asked whether Mayer "was following a protocol established by [Scenic America] when providing [Scenic America's] EIN with the understanding that [Scenic America] would accept its annual mandated percentage from the Account and return the remainder to Scenic Arizona"; and (4) the allegation that Falzone stated Scenic America would not honor the existing agreement to retain only 5% of any donation. (Doc. 1-6 ¶¶ 9–11, 14–16, 33, 36.) Falzone's alleged acknowledgement of and refusal to answer questions about a preexisting agreement at the December 10, 2024 Zoom meeting supports the existence of such an agreement. Falzone's Declaration does not dispute his actions at the Zoom meeting, and even if it did, disputes of fact are resolved in the plaintiff's favor at this stage. *Glob. Commodities*, 972 F.3d at 1106.

Scenic America also argues nothing in the documents it received indicate the Grant was intended to pay Scenic Arizona's dues and the terms of the Grant prevent the use of Grant funds to pay membership dues. The first part of this argument is a variation of the argument rejected above—lack of evidence of an agreement requiring Scenic America to remit to Plaintiff a portion of any third-party donation. Regarding the second part of the argument, it is not clear that the terms of the Grant prevent its use to pay Scenic Arizona's dues to Scenic America. Again, the Grant was designated for "Scenic Arizona," and Mayer was the donor. Thus, although the terms in the Schwab letter appear to prohibit Scenic Arizona from providing Mayer with any financial benefits, such as payment or waiver of membership fees, (*see* Doc. 10-1 at 13 ("No donor, donor advisor or individual related to the donor(s) and/or donor advisor(s) will receive any goods, services or more than an incidental benefit, including . . . membership fees."), this is not the same thing as prohibiting Scenic America from retaining a portion of a donation to Scenic Arizona for the payment of Scenic Arizona's affiliate dues.

Finally, Scenic America argues Scenic Arizona's claims arise out of Mayer's

unilateral actions in establishing the Account and listing Scenic America's EIN number as the beneficiary, which are insufficient to establish Scenic America's contacts with Arizona. (Doc. 11 at 7–8.) The case Scenic America cites in support of this argument is factually distinguishable and dealt with the issue of whether general personal jurisdiction existed, not specific personal jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415–16, 418 n.12 ("Because the case before us is one in which there has been an assertion of general jurisdiction over a foreign defendant, we need not decide the continuing validity of *Rosenberg* with respect to an assertion of specific jurisdiction."). Thus, its applicability is limited here. More importantly, Mayer's actions are not the basis of Scenic America's contacts with Arizona. Scenic America's relationship with Scenic Arizona, which preexisted the Grant, is the primary basis of Scenic America's contacts with Arizona. And Scenic America's retention of the Grant designated for Scenic Arizona is the basis for Scenic Arizona's claims, which arise out of the entities' relationship.

### C. The Exercise of Personal Jurisdiction is Reasonable

A seven-factor balancing test is employed to determine the reasonableness of asserting personal jurisdiction. *Briskin,* 135 F.4th at 761. The seven factors are:

> (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Id.* (quoting *Herbal Brands*, 72 F.4th at 1096). "No one factor is dispositive; a court must balance all seven." *Panavision Int'l*, 141 F.3d at 1323. Here, the exercise of personal jurisdiction does not offend any sense of fair play, nor would such exercise be unreasonable or unfair.[5]

---

[5] Notably, Scenic America does not argue that it would be unreasonable for it to defend this case in Arizona, (*see* Doc. 7 at 5; Doc. 11 at 5–8), effectively conceding the third factor of the specific jurisdiction test. *See Garcia v. GMAC Mortg., LLC*, No. CV-09-0891, 2009 WL 2782791, at *1 (D. Ariz. Aug. 31, 2009) ("If an argument is not properly argued and explained, the argument is waived." (citing LRCiv 7.2(i), (b), (c))); *Briskin*, 135 F.4th at 751 (explaining the defendant has the burden of presenting a compelling case that the exercise of jurisdiction is not reasonable).

The first factor weighs in favor of Scenic Arizona. Scenic America purposefully interjected itself into Arizona's affairs by its connection with its affiliate Scenic Arizona. In fact, Scenic America continues to maintain publicly to have "played a key role" in affecting public policy changes in the state. (Doc. 10-1 at 23.)

The second factor weighs slightly in favor of Scenic America. However, Scenic America has not proven the "inconvenience [of defending this suit in Arizona] is so great as to constitute a deprivation of due process." *Panavision Int'l*, 141 F.3d at 1323. While it would be more burdensome for Scenic America to litigate in Arizona rather than Pennsylvania or Washington D.C., "with the advances in transportation and telecommunications and the increasing interstate practice of law, any burden is substantially less than in days past." *CE Distrib.*, 380 F.3d at 1112.

The third factor weighs slightly in favor of Scenic America because the exercise of jurisdiction in Arizona may conflict with Pennsylvania's or Washington, D.C.'s sovereign interest in adjudicating state law claims against their domiciliary, Scenic America. *See Panavision Int'l*, 141 F.3d at 1323.

The fourth factor weighs in favor of Scenic Arizona, as "Arizona has a strong interest in protecting its residents from torts that cause injury within the state, and in providing a forum for relief." *Brainerd v. Governors of the Univ. of Alta.*, 873 F.2d 1257, 1260 (9th Cir. 1989).

The fifth factor weighs slightly in favor of Scenic Arizona. When evaluating the fifth factor, courts "have looked primarily at where the witnesses and the evidence are likely to be located." *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1489 (9th Cir. 1993). All of the individuals thus far involved in this case, other than Falzone, are located in Arizona, such as the executor of Mayer's estate, Schwab representatives who may have knowledge of the underlying account and transaction, as well as Scenic Arizona's board members. While corporate records of Scenic America are likely located in Washington, D.C., along with, perhaps, some additional evidence of the receipt of the Grant, most of the evidence could easily be produced by electronic means and, notably, is undisputed.

The sixth factor favors Scenic Arizona but is not weighed heavily. *Panavision*, 141 F.3d at 1324. Scenic Arizona presumably chose its home district because it thought it would receive convenient and effective relief here.

The seventh factor favors Scenic America because, while it may inconvenience Scenic Arizona to litigate in Washington, D.C. or Pennsylvania, they are alternate forums.

Weighing these seven considerations, the Court finds that the exercise of personal jurisdiction over Scenic America is reasonable and would comport with fair play and substantial justice. *See Burger King*, 471 U.S. at 476; *Panavision,* 141 F.3d at 1324 ("[W]e conclude that although some factors weigh in [defendant's] favor, he failed to present a compelling case that the district court's exercise of jurisdiction in California would be unreasonable."). Having failed to argue the reasonableness factor, Scenic America has not met its burden of presenting a compelling case that the exercise of jurisdiction in Arizona would not be reasonable.

Accordingly, the Court concludes the requirements for the exercise of specific personal jurisdiction are met at this stage of the litigation. Resolution of factual challenges which are intertwined with jurisdictional allegations must be resolved through discovery.

**IT IS ORDERED:**

1. Scenic America's Motion to Dismiss for Lack of Jurisdiction (Doc. 7) is **denied**.

2. Scenic America shall Answer Scenic Arizona's Complaint within **14 days** of the date of this Order.

Dated this 8th day of September, 2025.

Jennifer G. Zipps
Chief United States District Judge